Q. Good morning, Your Honor. My name is Larry Baumgartner. I'm from the People's Court of Virginia, and I represent the plaintiffs and their colleagues, John Quinn and Jonathan Wentz. The case of my case today is on the issue of, first of all, I think the four-court final is a presentation case of discrimination, so I don't think I need to address that unless there are questions about it. Then there was the issue became, in my mind, number one, how the lower court dealt with the factual issues that were presented to it. And most alarming to me in that decision was how the lower court dealt with the statements that were made to my client after he was told, by the way, my client worked for this only job he's ever had. He started at age 16, I think, as a box boy, and then worked his way up through the company and remains there to this day. It's the only job my colleague ever had. Let me ask you this. Essentially, four people get selected, correct? And obviously what Raley's is saying is that the candidates who were promoted had more management and customer service experience than Mr. O'Quinn. And they had either distinguished themselves either in customer service or commitment to the company. Does the fact that Mr. O'Quinn said that he would only work in one of the stores, how does that factor into this? Because obviously three of the four people were in other stores, correct? So, I mean, did he essentially take himself out of qualification for those positions? But, I mean, I guess can he complain about the other three jobs that he didn't get if he said, I don't want those jobs? But he would only take one of those, right? to people outside the store, which is one of the arguments that we have that shows pretext on part of Raley's. Because if they would have hired him in the store, there's no question that he was the most qualified person in the store. Well, this is where Raley's doesn't seem to have a consistent policy, because as you know from the record, Mr. O'Quinn was told early on that he might be Raley's first black manager. And then he proceeded to do all the things that he did. He took a management exam and passed that, which is what we consider to be an objective measure of his talent. And then, Raley's began promoting people without taking the exam or without any competition. In fact, in one case, an employee had been suspended for failing to get back to work, because he was humiliated over Mr. O'Quinn. Well, but okay, but we have to deal with the customer service first, right? I mean, were any of the other four people that got selected, is there something in the record that they had also been disciplined, or is the record silent on that? Okay, and there is indication in the record that Mr. O'Quinn has been, correct? Well, if you're going to drench up, if I'm not mistaken, it's Raley's record. Well, I'm just talking about the record. I just want to know what's in the record. Yes, but I don't know that that was, I think that was more a comedian's recitation by defense. The defense, once the case came, I don't know that that was part of the decision on whether Mr. O'Quinn was fit for his job, because all the discipline was years and years ago, and he was still working for the company. So I don't know if that was an element of the decision. I never saw anything that said it was. Okay, and they started with, was it 14 or 14, 14, 13 people on the list, something along those lines? And Mr. O'Quinn came out, I think, second to last. He wasn't last, correct, in that process? And then they selected four people, and he said he would only take, he would only go to Oroville. And the person that, so give me your best argument on, I'm going to, I think that you've got the prima facie case, then they say what their reasons were. So I'm really focusing on the pretext. Give me your best argument on what the record shows in terms of what you presented in terms of, to show that what was false about their reasons and pretext, and what was, to show that it was discriminatory. What was false about the reasons was that the company, first of all, switched the manner in which they were going to promote the CSM. First they said they were going to promote it from within the store. They changed that when Mr. O'Quinn showed to be the most prominent candidate for that. They sent out a letter saying, we are now going to expand the search for the CSM. Well, but at first he didn't even qualify, right? The first one they advertised, he didn't even qualify because you had to be a supervisor, right? I mean, a head clerk or whatever. He was a head clerk. But did he, when the first requirement that was shown, did he qualify to apply? He was a head clerk. This is the interesting part about Mr. O'Quinn's career. He was promoted, he ended up being a head clerk, and for a time he wasn't a head clerk. Then there was an argument erupted as to his status, and he was continued as a head clerk, but he didn't have the function of a head clerk. He got paid, he got the status, but he just wasn't fulfilling all of the duties of a head clerk, which is kind of an ironic way to deal with somebody. Why didn't he promote him? Well, see, I thought at first he didn't qualify under what the job spec said, and then they added, and then he did qualify by his experience, and I think also one of the other people that was selected that was some sort of manager that I think it was. LVM Martinez wouldn't have originally qualified, but then when they changed whatever the requirements, she was not a head clerk but was a second assistant drug center manager. Greg Arnovick was a head clerk. Mitch Clark was a head clerk. And Robin Montgomery was a head clerk. I couldn't finish your question because I also think the fact that the manner in which the panel was set up didn't seem to be of any benefit to Mr. O'Quinn's campaign to become the first black manager or raider because they were all internal people who were Caucasian who were going to decide whether or not he was going to be the first black manager, and they were all raiders, they were all legions of raiders, and Mr. O'Quinn is a rather bold looking man. And if you look at the – Well, they don't have to, I mean, obviously they don't have to set up a procedure that ensures that Mr. O'Quinn will be the first black manager of railways. That doesn't sound like that would be a very good employment. If, you know, I mean, that seems contrary to what you – if they set up any procedure that is set up to select a particular person, that seems to be problematic from a human resources standpoint. Well, I understand that because if you look at page 26 and 44 of the appellate's excellence record, there are the standards that the customer service manager must fulfill. And for somebody who's been there for 30 years and done everything in the store, I can't imagine anybody who was more well-qualified than Mr. O'Quinn who was in that store for all 50 years, with the exception of the possibility he came to the customer house and helped other stores get started. I hope I've responded to that. Well, he obviously was qualified enough to get in that, but you have to show in the pretext that the reason that he didn't get it was – I mean, they said more qualified people got it than he was. And they said the reasons were either in the customer service area and in the current most recent supervisorial experience. And he sort of went in and out of supervision either by his choice or by other people's choices. And the fact that they said that doesn't necessarily – Then you have to go to pretext. Then you have to go to pretext. Right. And the fact that Mr. O'Quinn testified that he has done all these things and that he is capable of doing all these things and he can fit in to that reference I made to you on the standards for the customer service, the fact that the panel says he isn't qualified doesn't mean he isn't qualified. It just creates a tension between what he says his qualifications are and what they say his qualifications are. So that's why I can't understand why we're here. We should be trying that issue before a jury because Mr. O'Quinn did so many things. He was a produce manager. He worked as a head clerk. He's worked as a cashier. He's done a lot of jobs in the store. In fact, Joe Hendry told him, I didn't realize that he's done everything in the store. So the issue of whether or not he was qualified, is an issue of fact that should be tried in this case and not decided on summary judgment. Because in reviewing all of the manner that the district judge approached this case, it doesn't feel like he's been screwing everything that O'Quinn presented against him rather than giving him the correct answer. Okay, he has to show the real reason he didn't get it was because he was black. Okay. Right? That's part of the pretext, right? All right. And you put in evidence certain comments that had been made over his 30-year career that were of a racial nature. How do we link those to the selection committee? A jury instruction comes in that the corporation must be treated as an individual. But when we get into these discussions, the corporation impregnates itself and says the right hand doesn't know what the left hand is doing. I don't think they can have it both ways. If they're going to be treated as an individual, they have to be regarded as an individual. When a manager says to a black employee who was supposed to be... Okay, well, I don't say that that can't occur. But I think that if you take it to the extreme, let's say someone made a racial remark in a 30-year period that was not sanctioned, you know, that there's no showing that it has anything to do with the decision-making process. Are you saying just because someone, not the decision-maker, in a huge corporation makes a racial comment, that that's enough to show pretext? That meets your burden of persuasion on pretext for summary judgment purposes. It may be a huge corporation, but the Oracle store is a very close-knit little work community there. And Mr. O'Quinn knows very well everybody involved in the process. He knew personally everyone involved. And the manager earlier than this election process, when the manager told him, we can't make you a manager because what if a customer comes in here and calls you a nigger? That very well informs him that the process isn't going the way he had planned for his career. Does that not make a statement of... Okay, but that, all right. Now, I'm not saying that doesn't have relevance, but that wasn't for the CSM position. That was before, correct? That was for a manager position. See, there are three. I think there are three managers. They do name them now. They call them store directors. All right, but the job he's challenging that he didn't get the CSM. And so for pretext, if he shows that other statements were made, he's got to show that to have some sort of causal link to the present position, correct? Or inferences that... Right. That's why he didn't get the job. And the background testimony that he gave, that he was able to lose the amount of managers that he worked for, that one manager told him he would not be promoted because he wouldn't want to have a black man telling him what to do. But I was concerned about the district court's statement in its decision regarding the, what if a customer came in and called you a nigger and the district court didn't regard that as a racist statement and made some remarks that it maybe was a good question to ask. I found that troubling because... I found a lot of things troubling about the district court judge's decision. He says O'Quinn has had, at best, a lackluster career. Why is the district court judge making findings of fact at summary judgment? That's exactly what I was wondering. He did a lot of that. He said that... He said he had an unremarkable career. None of the reasons were particularly strong. They have some very dubious, to use the word dubious, but it seemed like he was really judging the facts rather than deciding whether or not Mr. O'Quinn was carrying this burden, which isn't of creating a tribal issue of fact. Mr. O'Quinn, has he worked at this for so long? You have about three minutes left if you want to save it for a bottle. Yes. Okay, thank you. Good morning. Good morning, counsel. My name is Adam, and I'm a law firm sidebar attorney. I represent the defendant, Brayleys. And I can tell you there's been a variation in the arguments. The arguments, not every time you come up, that all the cases touch on a similar issue. Yes, well, they do batch cases, and if you're later on the calendar, sometimes you want to get up and object to something that somebody said on the first part of the calendar. To put it in context of your work this morning, the first case there was an argument about this morning was an argument that the selection criteria had been manipulated. In the second case, there was an argument that there were gender-based discriminatory remarks by the decision-maker. Okay? And in this case, we have neither of circumstances like that. We have very clean, pure selection criteria, and I'll get into that in a second. And moreover, we have no record whatsoever that decision-makers had any sort of discriminatory animals. And then there's another third critical fact, I think, that distinguishes the first and second cases that you're dealing with from this case, and that is, in those cases, the plaintiff is one of two or a small group of people. In the first case, it sounds like there were two people who were beaten past time, and this person, the plaintiff in that case, initially met the one-of-two-people criteria, and then the scores were changed by point and so forth, and he was pulled from that and not passed on to the second selection test. You know, in the second case, it sounded like it was a man and a woman, and the decision-maker won. In this case, there were 13 applicants. John McMillan ranked last on the selection panel of three of the five panels, ranked him last. If you did a cross-average, I think Chuck Connally was right. I think he was 12th out of 13. The highest student received was from the University of Oregon, the person that asked John McMillan to apply for the position. Mike Nassa ranked him sixth out of 13. Joanne Pinckery, who was the human resources professional on the five-person selection panel, rated him seventh. Interesting. One of the reasons—and it's in Ms. Pinckery's declaration— that Ms. McMillan ranked higher on her panel than some of the others was because some of the panelists didn't want to move. Okay? And so, Ms. Pinckery, that's a relevant fact, and whether you'd be considered for other scores, and quite a few of the applicants had taken positions that you're appointed to that don't want to stay at a particular score. Let me take a backdrop. So I think this case is, to me, based on what I've heard in my own records, it seems like an easier case than it really is. Now you're going to get some people objecting from the audience who suck around. Now, one of the facts—I think the selection criteria is important. One of the facts that Mr. Bobak has presented to you this morning was that initially, his client was told that someone would be hired from the Orville store for the customer service of the institution. Okay? That's the rest of the case that Mr. Bobak made. That is not reflected in the record. All right? It is due to fact by Rayleigh. It's fact 24. Cites the deposition testimony of Mr. O'Quinn and cites the affidavit declaration from Joanna Pinckery. And this—what Rayleigh was doing was introducing a new position into 60 of the stores, the customer service manager position, would be a front and face to the stores. The top two ranking positions in the stores are the store director and the assistant store director. And they're doing—while they're the leaders of the stores, they're doing backroom management, personnel issues, third-party measures, relationship issues, getting into corporate offices, and so forth. What Rayleigh wanted to do in establishing the customer service manager position— and this is in the record, and it's due to fact, number five from Rayleigh— is put a face on the store to take more customers in this world of big box competition. We, Rayleigh, put the customer first. So we're going to have a person there that isn't being pulled by all the other business of the store, a person dedicated solely and principally to the customers. Okay? And they set a very clear criteria. They did this in 60 stores in Northern California. And then what they did was they said, okay, let's have a neutral selection criteria. They came up with a very specific list of criteria. The biggest of the three most important—management experience, front-end experience, and I'm using that in short terms, so it's someone that handled the cashier, who needs coupons, specials, and all the other variety of things that go with front-end, at least increase the purchase of a parking lot, and make sure the spills are cleaned up. Okay. And then the third, of course, in the end result, I would say, is some customer relationship experience. All right? Somebody that showed that they had some talent and skill with customers. Those were very specific three criteria. They set those out and they posted it company-wide. All right? And Judge Conant, you're right initially that the bull—this is company-wide. The bull was headquarters. It said, let's promote it from headquarters. There was never any evidence in the record, because it's not true, that they were going to hire from within individual stores. Okay? People were invited and they could apply throughout the chain. And then later it was broken down into clusters, and there was a cluster in the Central Valley of four stores, which is Chico, Yuma City, and Mr. O'Quinn's store, which is Oracle. Okay? All right. So they had a selection panel. Then they— Yeah, but Mr. O'Quinn, did Mr. O'Quinn qualify for the first? He did not. He did not qualify. And this is another point. Mr. O'Quinn was a head clerk. There is a nuance to that fact. And the nuance is that in 1996, Mr. O'Quinn was demoted from head clerk after serving there for a six-month period, demoted from head clerk to journeyman clerk. And out of the kindness of the heart of the person that was the store manager in this meeting in the record, he was not demoted entirely, nor in pay, but he admits, Mr. O'Quinn admits in the record, that his duties were gutted and he no longer served as the head clerk on the night shift, but rather he returned to a journeyman clerk. And this happened earlier in his career in a slightly different manner. He had been a head clerk from 1985 to 1989. And in 1989, he stepped down and was called a hero. So, I mean, I guess arguably it could be disputed whether he was head clerk only in title or in duties or whatever. But does that really matter here since he qualified to apply for the job? I don't think it does matter in the sense that he has to prove pretext, and he has to prove that he was qualified. He has to build a strong enough case to establish that he was serving for an inference. And if you don't meet the initial burden of the case. But, well, okay, but you're not saying he didn't meet his initial burden. We did argue that in the lower court. All right. Are you still arguing that? Well, yes, I'm still re-assuming that argument. I don't think he's got a prima facie case. But more to the point, if he doesn't have a prima facie case, that he met the initial qualification. And Judge England said that he met it. You know, therefore, you admit that he was qualified because he met the initial. And my argument is that he didn't. It's a pretty hard argument to make that he wasn't – that he doesn't satisfy his prima facie case. I don't want to use much of my 20-minute report. I think it was – judges, it's not our strongest argument to make that case. But I think the relevance of it, Your Honor, is that his prima facie case was so weak that he can't rely – if you look at what the Ninth Circuit set out after Reeves in the Chain case, they said, listen, if you're going to be a pretext, you can't rely on your evidence that you have a prima facie case. In Chain, there was a UC Davis professor that was so incredibly qualified, okay, and he published articles and so forth, and he established a prima facie case, and he came back and the university said, we've got a legitimate reason for not hiring you and so forth. And what he did on some of the judgments, he came back and said, but I'm so incredibly qualified. In other words, he didn't submit any new evidence, and the Ninth Circuit said, okay, in that situation, you can rely on a prima facie case. Well, here, what's Mr. O'Connor's prima facie case? He barely, if at all – and we would contend that he doesn't, but it – But let's say, if we get over to pretext, I mean, there were, over his 30-year career, there were, you know, he did present evidence of racial animus, as it were. What, you know, why would you say that those don't satisfy his showing of pretext here? The reason I would say that is, first of all, look at the time of them. Okay? All of the evidence that he presented was dated. His principal claim, Mr. Wambach mentioned that, he'd be the first black manager, was a statement from the late 1970s. Mr. O'Quinn was a relatively new employee, made by people that were entirely not in the company anymore. There's no record that they were. They're not involved in the settlement now. Some of the remarks that he contributes to Bob George, who was his store manager here over at Oracle Store. Mr. O'Quinn admits on the record that he let Bob George last manage him in 1994. We're talking about the CSM position in September of 2001. Moreover, Your Honor, Well, I think his – I think he's trying to state his best argument is that this is – it sort of shows – there's an inference that shows that that's Raley's position relative to management promotions. Those facts would be in a case would be more relevant if Mr. O'Quinn had a record that qualified him for the CSM position. What happened in the CSM position was facts 50 to 54 in Raley's separate statement were undisputed about the qualifications and Raley's opinion about four candidates in New York that were selected. And Mr. O'Quinn, meanwhile, concedes in his deposition on pages 154 through 160, 228 through 235, and up to 238, that his experience at the front end of managing employees and with relationships with customers was sparse at best. And so if you take these – So if you're saying if he were more qualified, the persuasiveness and pretext would be slightly different? I think that the straight remarks in the past would have more relevancy and more kick. If he had been ranked 12 out of 13, and we haven't even gotten to the most compelling fact regarding his failure to be selected. Right, but I think part of the argument is that that was why he was ranked 12 out of 13. And I understand that there's an objective component to that too, but his argument is, yes, that's why he was ranked so lowly. And yet right now, that is an argument, because he hasn't linked any of those remarks to the panelists. And when you demonstrate remarks, that has to be put to the decision-maker. And if he feels like he's been discriminated against and denied promotion, well, that is an actionable claim that should have been brought within the statute of limitations, period. And we're talking about an entirely different selection. And really what we're dealing with here is if anybody can go back and say, okay, we've got a new job that's open. They've posted it. They've invited multiple applicants. They've given you clear criteria. There's no point in discussing the dispute. It's irrelevant. And then the person comes in, interviews, ranks 12 out of 13. Can they bring a claim and get a case in front of the jury if they bring in history of other people that said derogatory remarks to them over a 30-year career? And it just seems to me that if this is a classic case where the court has properly held that you've got to produce under the Godwin case law a change, you've got to produce specific and substantial evidence to rebut the pretext, to show that the reason that you selected was untrue, false, changing, not worthy of treaties, and that plus it was related somehow to discrimination. And Mr. O'Quinn testified that he didn't have much experience. And Mr. Bonner said moments ago that Mr. O'Quinn had been a checker. That's astounding. That representation is astounding. Mr. O'Quinn said in his deposition – first of all, he was a resident of the job. He never was a checker as a job that he had in his 30 years.  I stepped in once in 30 minutes in the past 12 years as a checker. So he didn't have the experience. And that's kind of where the case comes down. So when you look at these remarks, they don't add up a whole lot. You can't deal with a neutral process with decision-makers that have no bias and so forth. I mean, it just isn't a case where, like you said, You said that Mr. O'Quinn was still employed at rallies. Have you tried to settle this dispute? Have you tried to settle this?  He's employed. He's employed by rallies today, correct? Is that right? So apparently you have – apparently you have a dedicated employee, correct? So why wouldn't you want to try and resolve this dispute so everybody can get along and continue on in their good graces? I appreciate the question. The honest answer is I'm not aware that we've ever had meaningful settlement discussions. I would respectfully argue that in the case of litigation that that's not a factor that courts should use. No, I'm just curious. We often ask sometimes at this juncture because the circuit mediator has a – has had a lot of success. And we don't – I can assure you we don't take it one way or the other on the merits of the case. That's completely independent. But often we inquire just to see if that's a possibility. I mean, it's the kind of case you should be able to resolve. I mean, he's there. He's been a longtime employee. Your Honor, I think – A little mediation might go a long way. Since we're being candid, and I think Mr. Baumgartner would share this and help him to respond, Mr. Oakland is a strong personality and – You don't have to tell me. I'm just curious. That's all. I think if you saw the background and the context of the case, you might – you can fill that in. Well, you've considered that. Well, I don't think that, you know, obviously from the standpoint that I don't see that that really has any relevance to the summary judgment evidence. I mean, that's what we're considering here. Thank you. Just give me a moment. I appreciate all your questions. I wanted to make one last point. Maybe it's too much to start with because it's pretty important. And that is – and I'm sure it jumped out at you when you read the briefs and read it. That is that when Mr. Oakland was interviewed for this position, he not only did he state that he only wanted to work at the Oroville store and others stated a preference for a store. He indicated that he would only go outside of Oroville if Raley's executed and agreed to a 10- to 15-year individual employment contract with him. And the truth of the matter is – and he admitted in the deposition, and we learned his feedback, that he became very upset and agitated by the question about whether he would agree to move to another store. It's interesting to contrast that with the woman that ended up selected for that store. She agreed not only to go to the Oroville store, which she wasn't at, but she agreed to go to the Bo Chico store, the Union City store, and even to the Woodlands store that wasn't even part of that cluster. And Mr. Henry, who was part of the panel, took that to be evidence of a very strong commitment to the company. And instead, what Mr. Oakland did was in a kind of flippant, derogatory manner – and he conceded that on the record that he was being facetious – said, I'm going to work at 2325 Myers, and that was the address of the Oroville store, and then went on to say, I don't know if this employment contract that you're going to take me outside the union because the other stores were non-union. And Ray Lee, Mr. Henry, who was on the other panel, said, listen, we're looking for people that are committed and aren't worried about whether this is union, non-union, or any of that. We want a straight commitment, and to suggest in an interview for this customer service position that you're going to negotiate your own individual employment contract is startling. And so that's a fact that's undisputed, and Mr. Oakland admits that he became angry at the question, but I don't think we're forcing him to do it. So I think on that note, does it matter? I think we have your argument in hand, so thank you very much. Thank you. I understand Mr. McQuinn's expressions of frustration after committing 30 years of his life to a single employer and then being suggested that in order to get promoted, he'd have to abandon his union position, which he considered to be a security he had there in the whole hometown. Well, but is there anything that the other people were being treated differently on that? Well, a couple of the other people said they wouldn't move out. No, no, no, no. I mean, was there any indication that other people wouldn't have – would get anything other than a non-union job if they went there? I mean, that's neutral, isn't it? Anyone that applied for those positions was going to be in a non-union. Well, I don't know. It wasn't just Mr. Oakland, was it? I don't know how many people who applied for the job were in the union to begin with. I think Mr. McQuinn was the only one from the Oralist store, which is a union store. The rest of them aren't. Some of the people from outside the store who were interviewed for the jobs. Well, I just don't see how – I don't see how that can be different. That can factor into why he might not want to work there. But I don't see how you can put that negatively on Raley's when anyone that went to any of those other stores was going to be in a non-union position. I'm just trying to explain Mr. McQuinn's point of view when he would be asked to do something like that. They shouldn't criticize him for not wanting to leave his home store. Counsel talked about the use of clean, pure selection criteria and compared it with the first case that you heard today where they brought people from all over the place, not affiliated with a particular district, and had them do the evaluation. That's not the case here. This is not a complete clean, pure selection criteria. These are people within the store who Mr. McQuinn knew who were going to be judged whether or not he should be promoted. What's the best evidence you have in the record that there is a nexus between the discriminatory comments made to him and the selection panel? Right. I mean, there are cases, of course, where you have a decision maker who has made discriminatory comments, and that's the best nexus. But what's your best evidence in the record at this juncture of a nexus between the people who made the selection and the discriminatory comments that you put in as evidence of pretext? The people who worked with Mr. McQuinn in the store and who were aware of Mr. McQuinn's history with the store and the tension that existed within the store between white and black employees. But there were people who were very familiar with the store. They were all of the greatest people who had risen up through the ranks. And so that's the only nexus that I can raise for you other than the statements that were made by rankings that we attribute to their general overall attitude toward promoting black people. And I would point out, of course, the legal prohibition against racial discrimination drives racial discrimination further underground. The closer the racist policy gets to actually implementing its attitude, the harder it is for us to discern what it's about. And I think a fact finder in this case would be enormously helpful to sitting down and judging the demeanor of the various people who were involved in Mr. McQuinn's life, perhaps during their entire careers, with the rainy store. So I really felt that the nexus problem is by inference only, and there is no direct evidence to whether there was a nexus. But I think that is such a subtle issue and so difficult that it shouldn't be decided on paper, but should be decided by having real human beings testify in a courtroom so they can be evaluated by prior facts. Thank you, counsel.  Thank you. And we'll proceed to the final case on the argument, Candler-Thaler v. Harris Operating.
judges: Thomas, Paez, Callahan